No. 845    November 27, 2024    379

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Michael DERBY
and Janice Derby,
*Plaintiffs-Respondents,*

*v.*

COLUMBIA COUNTY,
*Defendant-Appellant,*
*and*

Jeffrey DICKERSON et al.,
*Defendants.*

Multnomah County Circuit Court
19CV17239; A180307

Adrian L. Brown, Judge.

Argued and submitted February 26, 2024.

Ruth A. Casby argued the cause for appellant. Also on the brief were Janet M. Schroer and Hart Wagner LLP.

Jacob Johnstun argued the cause and filed the brief for respondents.

Before Tookey, Presiding Judge, Egan, Judge, and Kamins, Judge.

TOOKEY, P. J.

Affirmed.

Kamins, J., dissenting.

**TOOKEY, P. J.**

Defendant Columbia County appeals a judgment entered after a jury trial, which resulted in a verdict in favor of plaintiffs, Janice Derby and Michael Derby. The jury found that defendant, through its jail, was negligent in "failing to adequately train staff regarding mental illness." It also found that that negligence caused a former inmate of the Columbia County Jail, plaintiffs' son William, to attack Mrs. Derby with a knife, seriously injuring her. Mr. Derby witnessed, contemporaneously, William's attack on Mrs. Derby, and he suffered serious emotional distress as a result.

Plaintiffs' theory at trial was that defendant's negligence caused jail staff to mistreat William—who has been diagnosed with schizophrenia—and that that mistreatment caused William to enter a psychotic state and attack Mrs. Derby.[1]

On appeal, defendant raises three assignments of error. In the first assignment of error, defendant contends that the trial court erred in denying its motions for summary judgment. As explained below, however, an order denying summary judgment is not reviewable following a full trial on the merits, unless the motion rests on purely legal contentions that do not require the establishment of any predicate facts.

Aspects of defendant's first assignment of error are unreviewable for that reason. But defendant's first assignment of error also raises an issue that may be reviewable because it rests on purely legal contentions, *i.e.*, whether violation of duties of care owed to William can support liability for plaintiffs' injuries absent a special relationship with defendant. Assuming that issue is reviewable, we address that issue and reject defendant's contention that it could not be held liable to plaintiffs due to the absence of a special relationship between plaintiffs and defendant in our consideration of defendant's third assignment of error.

In the second assignment of error, defendant contends that the trial court erred in denying its motion for a

_____

[1] For that conduct—as the jury in this case was made aware—William was adjudged to be guilty except for insanity, because, as a court found, at the time he attacked his mother, he "lack[ed] substantial capacity either to appreciate the criminality of the conduct or to conform his conduct to the requirements of the law."

directed verdict as to plaintiffs' claim that defendant was negligent in failing to train jail staff regarding mental illness. As to that aspect of defendant's second assignment of error that defendant preserved, we conclude that the trial court did not err.

Finally, in the third assignment of error, defendant contends that the trial court erred in denying its motion for a directed verdict as to Mr. Derby's claim for negligent infliction of emotional distress. Again, as to the preserved aspects of defendant's third assignment of error, we conclude that the trial court did not err.

Consequently, we affirm. We provide additional historical facts and procedural history as necessary in our discussion of each of defendant's assignments of error.

## I.   DEFENDANT'S FIRST ASSIGNMENT OF ERROR

In its first assignment of error, defendant contends that the "trial court erred in denying defendant's motion for judgment against plaintiffs' third-party custodial care claim[.]"

Defendant's briefing is not entirely clear as to what ruling it is challenging in this assignment of error, *cf.* ORAP 5.45 (requiring that "[e]ach assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged"), but, from oral argument, we understand defendant to be challenging the trial court's denial of its motions for summary judgment.

As noted above, "an order denying summary judgment is not reviewable following a full trial on the merits, unless the motion rests on 'purely legal contentions' that do not require the establishment of any predicate facts." *York v. Bailey*, 159 Or App 341, 345, 976 P2d 1181, *rev den*, 329 Or 287 (1999). A "motion rests on 'purely legal contentions' when the facts are not merely undisputed but immaterial, such as a facial challenge to the constitutionality of a statute." *Farnsworth v. Meadowland Ranches, Inc.*, 321 Or App 814, 820, 519 P3d 153 (2022) (some internal quotation marks omitted). Put another way, "the legal theory underlying the motion must be that the moving party has a right to prevail

on any set of facts and that the facts, in effect, do not matter." *Id.* (internal quotation marks omitted).

Defendant argues in its first assignment of error that "the jail's duties of care owed to William did not give rise to an obligation to protect plaintiffs from his post-release violence" and "plaintiffs injuries from William's violent attack were not a legally foreseeable result of the jail's alleged negligence." In our view, aspects of defendant's first assignment of error rest on predicate facts that do "matter," *e.g.*, William's custodial status when he attacked Mrs. Derby with a knife, the county's control over William, and what defendant calls "[p]rospective [f]acts" that "[p]recluded [l]egal [f]oreseeability." And to the extent that they do, the denials of the motions for summary judgment are not reviewable on appeal. *Freeman v. Stuart*, 203 Or App 191, 194, 125 P3d 786 (2005) ("To escape the general rule of unreviewability, the denial of summary judgment must rest on a legal issue that requires no predicate facts at all.").

But, in its first assignment of error, defendant also makes certain assertions that appear to raise an issue that may be reviewable, because it may rest on a purely legal contention, *viz.,* that violation of the duties of care owed to William cannot support liability for plaintiffs' injuries absent a special relationship with defendant. In our discussion of defendant's third assignment of error, which, as noted, concerns the trial court's denial defendant's motion for a directed verdict on Mr. Derby's negligent infliction of emotional distress claim, we address certain issues related to the jail's "duties of care" and whether defendant may be held liable for plaintiffs' injuries under general principles of foreseeability even in the absence of a special relationship, *i.e.*, those issues in plaintiffs' first assignment of error that may be reviewable. And to the extent that defendant's first assignment of error raises a reviewable issue, we reject it.

## II.   DEFENDANT'S SECOND ASSIGNMENT OF ERROR

In its second assignment of error, defendant contends that the "trial court erred in denying [a] directed verdict against plaintiffs' claim that inadequate mental illness

training for jail staff caused William Derby's mental health to deteriorate into a dangerous psychotic state that foreseeably resulted in his violent attack on Mrs. Derby."

We understand defendant to contend both that plaintiffs (1) failed to present legally sufficient evidence that defendant's negligent training of jail staff *caused* plaintiffs' injuries and (2) failed to present legally sufficient evidence that its training of jail staff was, in fact, negligent.

In response, plaintiffs contend first that defendant's arguments with regard to causation are not preserved, because "defendant[] never made a motion or objection where they argued lack of training could not be reasonably found to have caused William's mental deterioration and subsequent attack on Mrs. Derby." Second, plaintiffs contend that they adduced sufficient evidence that defendant was negligent in its training of jail staff with regard to treatment of mentally ill inmates.

We agree with plaintiffs regarding preservation. In its motion for a directed verdict regarding plaintiffs' negligent training claim, defendant argued:

"The *** next allegation is failing to adequately train staff regarding mental illness. Plaintiffs' case did not identify what additional training was available to Defendants, that they should have taken advantage of or availed themselves of.

"There's been no evidence that the jail failed to meet the training requirements that they are obliged to meet under the [Department of Public Safety Standards and Training] standards or that they failed to meet *** the best practices or recommendations within Oregon, under the Oregon jail standards, in terms of training requirements.

"The only evidence that I believe was [introduced] on that was questioning [a sheriff and a former sheriff], and their testimony was *** all of the training that *** the officers received, both in the academy and subsequent to the academy, was sufficient."

Thus, we understand defendant to have argued in its directed verdict motion that the evidence was insufficient for the jury to find that defendant was negligent in

failing to adequately train jail staff. It did not argue, however, as it does on appeal, that there was an absence of evidence that the failure to adequately train jail staff *caused* plaintiffs' injuries, and we conclude that the causation argument defendant now raises on appeal is not preserved. *See John Hyland Const., Inc. v. Williamsen & Bleid, Inc.*, 287 Or App 466, 472, 402 P3d 719 (2017) ("To demonstrate preservation, the appellant must show that the argument it makes on appeal is one that was presented to the trial court, giving that court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal." (Internal quotation marks omitted.)); *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) ("We have previously drawn attention to the distinctions between raising an *issue* at trial, identifying a *source* for a claimed position, and making a particular *argument*. The first ordinarily is essential * * *." (Internal citation omitted; emphases in original.)).[2]

We turn to defendant's argument that is preserved—*i.e.*, that the trial court erred in denying its motion for directed verdict based on the legal insufficiency of the evidence that it was negligent in "failing to adequately train staff regarding mental illness.".

"We review the denial of a motion for directed verdict for 'any evidence to support the verdict' in favor of the nonmoving party." *Lyons v. Beeman*, 311 Or App 560, 563, 494 P3d 358, *rev den*, 368 Or 513 (2021) (quoting *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003)). "We will not disturb the jury's verdict unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the claim or claims on which plaintiff[s] prevailed." *Id.* at 564.

---

[2] Although we conclude that the causation argument defendant now raises on appeal is not preserved, as to the merits of that argument, we note the following testimony from the trial related to causation from one of plaintiffs' expert witnesses:

"[Plaintiffs' Counsel]: If the jail had abided by accepted standards as they relate to mentally ill inmates, do you believe this attack would have happened?

"[Plaintiffs' Expert Witness]: No. It would not have happened."

Here, when viewing the evidence in the light most favorable to plaintiffs, as the non-moving parties, and "extend[ing] to [plaintiffs] the benefit of every reasonable inference that may be drawn from the evidence," *Shockey v. City of Portland*, 313 Or 414, 422-23, 837 P2d 505 (1992), *cert den*, 507 US 1017 (1993), we conclude the evidence was sufficient for the jury to find that defendant was negligent in "failing to adequately train staff regarding mental illness." Among other evidence adduced at trial was expert testimony concerning defendant's policies, and lack thereof, concerning mentally ill inmates, and information about defendant's training of corrections officers regarding mental illness. In fact, defendant acknowledges on appeal that there was evidence that "the amount of ongoing mental illness training was inadequate."

From that evidence, the jury could find that defendant was negligent in "failing to adequately train staff regarding mental illness."[3]

## III.   DEFENDANT'S THIRD ASSIGNMENT OF ERROR

In its third assignment of error, defendant contends that the "trial court erred in denying defendant's directed verdict motion against Mr. Derby's [negligent infliction of emotional distress] claim that rested both on the viability of Mrs. Derby's third-party negligence claim and on the viability of bystander liability for witnessing William's violent attack on his wife."

In support of that contention, defendant first argues that Mr. Derby's claim for negligent infliction of emotional distress is derivative of Mrs. Derby's negligence claim, and that Mrs. Derby's claim fails. That specific argument,

---

[3] Defendant also argues in its second assignment of error that the jury "found jail staff did not mistreat William" and the "only reasonable inference from that conclusion is that jail staff was not negligently trained regarding mental illness."

To the extent defendant is arguing that the jury verdict is inconsistent, because, as defendant sees it, the jury found that jail staff were both negligently trained and did not mistreat William, defendant has waived that issue by not making an appropriate motion in the trial court before the jury was discharged. *Croghan v. Don's Dugout, LLC*, 262 Or App 130, 131, 325 P3d 38 (2014) ("The Oregon appellate courts long have held that a party that believes a verdict is inconsistent must (a) object to the verdict before the verdict is received and the jury is discharged; *and* (b) request that the matter be returned to the jury for clarification under ORCP 59 G(4)." (Emphasis in original)).

however, was not preserved for appeal; defendant did not make that argument in its motion for a directed verdict on Mr. Derby's negligent infliction of emotional distress claim. Therefore, we do not consider it.[4] *See State v. Murphy*, 306 Or App 535, 539, 475 P3d 100 (2020), *rev den*, 367 Or 559 (2021) ("As a general matter, for us to address an argument on appeal, the adversely affected party must have preserved the claim of error before the trial court.").

But defendant also raises two contentions in its third assignment of error that, although presenting a close question regarding preservation, we conclude are preserved. First, defendant contends that violations of "duties of care owed to William does not support liability for [plaintiffs' injuries] absent a special relationship with Columbia County jail." Second, defendant contends that Mr. Derby's claim does not fall within the theory of "bystander recovery" recognized as viable by the Supreme Court as viable in *Philibert v. Kluser*, 360 Or 698, 385 P3d 1038 (2016), because Mr. Derby did not "witness or perceive the jail's alleged negligent treatment of William while he was incarcerated in 2016 and 2017." We address each argument in turn.

A.  *A Special Relationship Between Mr. Derby (or Mrs. Derby) and the Jail Was Not Required*

On appeal, defendant argues that, because plaintiffs did not have a "special relationship of their own with the jail," Oregon law "precludes liability for William's acts of violence." As defendant sees it, for that reason, the trial court should have granted its motion for a directed verdict.

Although we address this argument within our discussion of defendants' third assignment of error, as framed by defendant on appeal, the legal issue presented is not

---

[4] On appeal, at oral argument, in contending that that argument was preserved, defendant pointed to a portion of its motion for directed verdict where it argued to the trial court that, given the circumstances of this case, Mr. Derby was required to have a "special relationship" with the jail to assert a claim for negligent infliction of emotional distress against it

In view of that argument made to the trial court, we conclude that defendant did preserve an argument that plaintiffs' claims in this case required them to demonstrate a special relationship between plaintiffs and defendant. Although, as discussed later in this opinion, we ultimately conclude that that argument fails.

specific to Mr. Derby's claim for negligent infliction emotional distress. Instead, as framed, the question is whether the trial court erred when it concluded that a special relationship was not required for either of plaintiffs' negligence claims to go to the jury, because the trial court relied on "principles of foreseeability" and "Oregon law rejects that basis of liability for third-party injuries."

Defendant's argument rests largely on the *Restatement (Second) of Torts* section 315 and section 319 (1965), and the Supreme Court's decisions in *Buchler v. Oregon Corrections*, 316 Or 499, 853 P2d 798 (1993), and *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987).

Section 315 states a "general rule of non-liability for the conduct of others." *Buchler*, 316 Or at 505 (emphasis omitted). It provides that:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a)   a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b)   a special relation exists between the actor and the other which gives to the other a right to protection."

Section 319, in turn, "describes an exception" to that general rule. *Buchler*, 316 Or at 506. Specifically, it "states a duty that may exist between a defendant jailer having custody of a prisoner and third persons whom the prisoner may harm." *Id.* Under Section 319:

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

In *Buchler*, the court concluded that a "jailer," such as defendant in this case, "has no special relationship to members of the general public." 316 Or at 506-07. It also adopted the "common-law rule, delineated by section 319 to define a custodian's duty in modern times." Finally, in

*Fazzolari*, the court explained that "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff" *unless* "the parties invoke a status, relationship or a particular standard of conduct that creates, defines, or limits the defendant's duty."[5] 303 Or at 17.

    In view of those authorities, defendant argues that, because "the jail had no control over William when he committed the violent attack on Mrs. Derby *** after he was released from incarceration[,]" section 319 "does not apply and cannot serve as the source of liability for plaintiffs' injuries that William inflicted." Defendant further argues that "in the absence of a special relationship and no liability based on a 'duty to control' William after his release from custody [under Section 319]," plaintiffs were required to rely solely on "general principles of foreseeability as the source of legal responsibility" and, as noted, takes the view that "Oregon law rejects that basis of liability for third-party injuries."

    We disagree with defendant. That is because, even assuming that defendant is correct, and that section 319 does not apply in this case—an issue that we need not decide—because William was not under defendant's control at the time when he attacked his mother, defendant is nevertheless subject to "the general duty to avoid conduct that unreasonably created a foreseeable risk of harm to a plaintiff." *Faverty v. McDonald's Restaurants*, 133 Or App 514, 523, 892 P2d 703 (1995), *rev dismissed*, 326 Or 530 (1998).

    Our decision in *Faverty* is helpful in this case. There, we affirmed a judgment in favor of the plaintiff, awarding damages for injuries that he suffered when his van was struck by a car driven by the defendant's off-duty employee. *Id.* at 517. The plaintiff's theory was that the defendant was "working [the employee] unreasonably long hours, knowing that he would then be a hazard to himself and others when he drove himself home from the work place." *Id.* The defendant

---

    [5] As we recently recognized, Oregon courts have "grappled with that clause" from *Fazzolari* for decades. *Stone v. Witt*, 331 Or App 722, 726, 548 P3d 497, *rev allowed*, 372 Or 718 (2024).

argued that, because he had an employer-employee relationship with the driver who struck the plaintiff's van, plaintiff's claim was governed by sections 315 and 317 of the *Restatement*, the latter of which provides an exception to the "general rule of nonliability for the conduct of others that is stated in section 315 of the *Restatement*." *Id.* at 523. Section 317 provides, in pertinent part:

> "A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if [certain conditions are met, including that] the servant * * * is upon the premises in possession of the master [or] is using the chattel of the master."

As the defendant saw it, "because the evidence shows that the accident that caused plaintiff's injuries occurred off defendant's premises and did not involve the use of its chattels, the exception to the general rule that is described in section 317 does not apply and, therefore, it is entitled to rely on the general rule of nonliability for the conduct of others that is stated in section 315." *Id.* at 523.

We rejected that argument, reasoning:

> "Accepting, for the sake of argument, that section 317 does not apply, defendant is not entitled to limit its duty to plaintiff by invoking section 315. The limitation of section 315 does not arise out of any particular status, relationship or statutory standard of conduct. It is a standard that, according to the *Restatement (Second) of Torts,* applies to all persons. However, under *Fazzolari,* unless a defendant invokes a special status or relationship, or is subject to a particular statutory standard of conduct, it is subject to the general duty to avoid conduct that unreasonably creates a foreseeable risk of harm to a plaintiff. *Fazzolari,* 303 Or at 17; *see also Fuhrer v. Gearhart By The Sea, Inc.,* 306 Or 434, 438, 760 P2d 874 (1988)."

*Faverty*, 133 Or App 524 (footnote omitted). That is, we concluded in *Faverty* that the absence of liability based on a special relationship under *Restatement* section 317 did not foreclose looking to general principles of foreseeability to determine whether the defendant could be held liable to the

plaintiff. *See Washa v. DOC*, 159 Or App 207, 226-28, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403 (2003) (De Muniz, J., concurring) (discussing *Faverty*).

So too, here, with regard to section 319. That is, the absence of liability based on a special relationship or status under *Restatement* section 319 does not foreclose looking to general principles of foreseeability to determine whether the defendant could be held liable to the plaintiffs. *See McAlpine v. Multnomah County*, 166 Or App 472, 481, 999 P2d 522 (2000), *rev den*, 336 Or 60 (2023) (explaining that, in *Buchler*, "the absence of liability based on a 'special relationship' under section 319 did *not* foreclose resort to general foreseeability" (emphasis in original));; *see also Washa*, 159 Or App at 227 (De Muniz, J., concurring) (noting *Restatement* section 317 and *Restatement* section 319 operate in an "analogous" fashion).[6]

Moreover, that general principles of foreseeability apply in this case as a means of establishing liability remains true even though this case involves the acts of a third person, William: As we have explained, and contrary to defendant's arguments, "the intervening criminal acts of a third person do not necessarily preclude liability in the absence of a special relationship." *Buchwalter-Drumm v. Dept. of Human Services.*, 288 Or App 64, 80, 404 P3d 959 (2017) (internal quotation marks omitted). Rather, "[u]nder general foreseeability principles, the defendant may be found liable if it was reasonably foreseeable to defendant that plaintiffs would suffer harm as a result of intervening criminal acts and if defendant unreasonably created the risk of the harm that befell plaintiffs or, stated differently, provided more than 'mere facilitation' of the third party's criminal acts." *Id.* (internal brackets and quotation marks omitted); *see also Stone v. Witt*, 331 Or App 722, 724, 548 P3d 497, *rev allowed*, 372 Or 718 (2024) ("[W]hen the typical

---

[6] In his concurrence in *Washa*, Judge De Muniz took the view that *Faverty* was incorrectly reasoned and that we should "should revisit and repudiate" its analysis. *Washa*, 159 Or App at 228 (De Muniz, J., concurring). Indeed, as he saw it, "permitting plaintiffs who cannot prevail under section 319 to recover under open-ended principles of reasonable foreseeability makes no sense legally or practically." *Id.* at 226-27.

But we have not repudiated our analysis in *Faverty* or the cases that followed it, such as *McAlpine*, and we think our analysis in those cases is controlling here.

foreseeability framework articulated in *Fazzolari* applies—
when the plaintiff alleges that the defendant's conduct *created* a risk to a universally protected interest like the interest in avoiding physical harm—that is the end of the matter
* * *." (Emphasis in original).

And, here, plaintiffs' theory of liability was not just
that defendant "mere[ly] facilitat[ed]" William's criminal
acts, but that defendant unreasonably created the risk that
William would become psychotic and act violently through
its negligent conduct.

In sum, we conclude that, although Mr. Derby and
Mrs. Derby did not have "special relationship[s] of their own
with the jail," Oregon law does not necessarily preclude
defendant's liability for William's acts of violence, because,
as noted above, a defendant may be held liable based on general principles of reasonable foreseeability.[7]

---

[7] In its first assignment of error—which, as noted, concerns the trial court's ruling on defendant's summary judgment motions—defendant argues that "the circumstances of this case extend beyond the reaches of legal foreseeability and should have been dismissed as a matter of law." And, in its third assignment of error—which concerns defendant's motion for directed verdict as to Mr. Derby's negligent infliction of emotional distress claim—defendant refers back to that argument from its first assignment of error.

We do not think that defendant preserved an argument during its directed verdict motion on Mr. Derby's claim that "the circumstances of this case extend beyond the reaches of legal foreseeability": During defendant's directed verdict motion, the trial court noted certain evidence in the record that would lend support to a jury finding that William's post-release conduct was foreseeable, and it asked defendant about its position on foreseeability. In response, defendant did not make an argument as to why the injuries to plaintiffs were not foreseeable—instead, defendant merely reiterated its view that "foreseeability * * * simply does not apply."

But, even if the issue of foreseeability was preserved at trial, considering the circumstances of this case, we conclude that this is not such a "concatenation of highly unusual circumstances," *Piazza v. Kellim*, 360 Or 58, 94, 377 P3d 492 (2016) (internal quotation marks omitted), that it was error for the trial court to allow the jury to decide the issue of foreseeability.

The question whether a defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff, is a normative one; that is, determination of that question is laden with social values." *Clark v. Univ. of Oregon*, 319 Or App 712, 720, 512 P3d 457, *rev den*, 370 Or 471 (2022) (internal citation and quotation marks omitted). "Because reasonable foreseeability invokes a community's application of its own values, whether a particular outcome of conduct is foreseeable is most appropriately decided by the community's closest proxy in our civil justice system, that is, by a jury." *Piazza,* 360 Or at 94.

That conclusion does not, however, end our analysis. As explained below, and as defendant to argues on appeal, "foreseeability[] standing alone" *is insufficient* to recover damages for negligent infliction of emotional distress, which are the type of damages that Mr. Derby sought to recover in this case. *Philibert*, 360 Or at 703. But "recovery for foreseeable emotional damages is available when defendant's conduct infringed some legally protected interest apart from causing the claimed distress." *Id.* at 704 (internal quotation marks and brackets omitted); *see also Tomlinson v. Metro. Pediatrics, LLC*, 362 Or 431, 452, 412 P3d 133 (2018) ("[A]lthough emotional distress is not always a sufficient injury to establish a negligence claim, if the plaintiff establishes a negligence claim based on physical injury or *the invasion of some other legally protected interest*, then, generally speaking, the pain for which recovery is allowed includes virtually any form of conscious suffering, both emotional and physical." (Emphasis added.)).

Here, Mr. Derby asserted that such a legally protected interest was violated, *viz.*, the interest in "avoiding being a witness to the negligently caused traumatic injury or death of a close family member," which the Supreme Court recognized as a legally viable theory of "bystander recovery" for emotional distress damages in *Philibert*. *Id.* at 708.

Consequently, we next turn to *Philibert*, and defendant's arguments concerning *Philibert* and Mr. Derby's negligent infliction of emotional distress claim.

B.   *Bystander Recovery under* Philibert v. Kluser

In *Philibert*, the Supreme Court considered the circumstances under which "a bystander who suffers serious

---

Here, among other evidence, there is evidence in the record from which the jury could have found, among other facts, that, while incarcerated, at times, William had the delusion that his mother was an imposter (that is, that his mother were not really his mother), that William had previously engaged in violent conduct toward his parents when out of jail (and his parents had, at times, taken out restraining orders against him), and that various aspects of his treatment in jail could have caused a psychotic episode and worsened his schizophrenia. *Piazza*, 360 Or at 81 ("Facts pertaining to the similarity, frequency, and recency of prior criminal acts, committed under the same or similar circumstances, or at or near the same location, and involving the same or similar types of victims, as well as the place and character of the location of the current criminal act, are all relevant to the determination [of foreseeability].").

emotional distress as a result of observing the negligent physical injury of another person" may recover damages for that distress. *Id.* at 700.

As noted above, defendant contends that Mr. Derby's negligent infliction of emotional distress claim does not fall within the theory of "bystander recovery" recognized as viable by the Supreme Court in *Philibert*, because Mr. Derby did not "witness or perceive the jail's alleged negligent treatment of William," but instead only witnessed William's conduct *vis-à-vis* Mrs. Derby.

Because *Philibert* is central to defendant's arguments, we discuss it in some depth next before returning to defendant's arguments.

1.   Philibert v. Kluser

In *Philibert*, the plaintiffs witnessed the death of a family member who was run over by a truck, though the plaintiffs themselves were not physically injured. *Id.* at 700. The plaintiffs sought recovery for their emotional distress. *Id.* In considering whether they could recover for their emotional distress absent physical injury, the Supreme Court explained that "foreseeability is a pragmatic limit on liability for negligently caused *physical* harm because of the relative scarcity of physical injury[,]" but that foreseeability, "standing alone, is not a useful limit on the scope of liability for emotional injuries" because, in "contrast to physical harms, emotional harms occur frequently." *Id.* at 703-04 (emphasis in original). Therefore, permitting recovery for emotional injuries "without some limiting principle in addition to foreseeability" would create "indeterminate and potentially unlimited liability." *Id.* at 704.

Nevertheless, the court recognized that, as noted above, "even where a plaintiff has not been physically harmed, recovery for foreseeable emotional damages is available when defendant's conduct infringed some legally protected interest apart from causing the claimed distress." *Id.* at 704 (internal quotation marks and brackets omitted). It concluded that at least one such interest is provided by the common law—*viz.*, "the interest in avoiding being a witness

to the negligently caused traumatic injury or death of a close family member." *Id.* at 707.

Ultimately, the court adopted the "test for bystander recovery" articulated in the *Restatement (Third) of Torts* section 48 (2012), which "reflects [a] rule first adopted by the California Supreme Court in *Dillon v. Legg*, [68 Cal 2d 728,] 441 P2d 912 (Cal 1968), and the evolution of that rule." *Restatement* § 48 comment a. Under *Restatement* section 48, a defendant "'who negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury.'" *Philibert*, 360 Or at 712 (quoting *Restatement* § 48).

The court went on to explain that that test from the *Restatement* has four elements: The first element identified in *Philibert* is that "the bystander must witness a sudden, *serious physical injury* to a *third person* negligently *caused* by the defendant." *Id.* at 713 (emphases in original.) The court explained that its decision in *Hammond v. Central Lane Communications Center*, 312 Or 17, 816 P2d 593 (1991), is an example of a case in which that element was not present.

As explained by the court in *Philibert*, in *Hammond*, the plaintiff awoke "to find her husband lying on the floor, apparently the victim of heart attack." *Philibert*, 360 Or at 712. She sought to recover damages from a 9-1-1 service "for her severe emotional distress, alleging that if the defendant 9-1-1 service had arrived in the 'couple of minutes' that the 9-1-1 operator predicted, rather than after the 45 minutes that actually elapsed, she would not have suffered emotional distress." *Id.* at 712-13. The court did not allow recovery in *Hammond*, because "[a]lthough the defendant may have contributed to the death by failing to respond quickly enough, the defendant did not cause the actual physical injury—the heart attack." *Philibert*, 360 Or at 713.

The second element identified in *Philibert* is that "the plaintiff must have suffered *serious* emotional distress." *Id.* at 713 (emphasis in original). The court explained that "emotional distress is an unavoidable and essential part of

life" and, therefore, "cases allow compensation for only serious emotional distress." *Id.*

The third element identified in *Philibert* is that "the plaintiff must have perceived the events that caused injury to the third person as they occurred." *Id.* at 713. The court explained that:

> "contemporaneous perception is at the core of the bystander's action for damages. Observation of the scene of an accident after it has happened, or perceiving a recently injured person, does not meet this requirement. This bright line rule is justified in part by the fact that the distressing life experience of learning about the death or injury of a loved one is unavoidable. Its inevitability means that in a general way one is prepared for it. In comparison, the visceral experience of witnessing the sudden death or injury of a loved one *** is *not* a certain part of life and therefore presents a stronger basis for allowing recovery against the tortfeasor."

*Id.* at 713-14 (internal quotation marks and citation omitted; emphasis in original).

Fourth, and finally, "the physically injured person [must] be a close family member of the plaintiff." *Id.* at 714. That is, "[w]itnessing the injury of a stranger or acquaintance, while likely distressing, is not sufficient to recover." *Id.*

In adopting the *Restatement* test in *Philibert*, the court recognized that "[f]or as long as courts have awarded damages for emotional injuries, there have been concerns about plaintiffs bringing false claims," but noted that "[l]aws also may be structured to deter false claims by sympathetic plaintiffs whose charisma may evoke inconsistent and unpredictable jury verdicts." *Id.* at 714-15. As the court saw it, the *Restatement* test performs that function by including elements that "on the basis of human experience, are objective indicators of possibly serious emotional injury." *Id.* at 715. That is, "[w]hen the elements of the test are met, a plaintiff's claims of subjective emotional distress are more likely to be genuine." *Id.*

   2.   *The Instant Case*

With that understanding of the *Restatement* test for bystander recovery and *Philibert*'s discussion of that test,

we turn back to defendant's argument. Defendant argues that Mr. Derby's claim fails under the first and third elements of the test adopted by the Supreme Court in *Philibert*. Specifically, quoting from *Philibert*, defendant argues that Mr. Derby's claim fails because (1) he did not witness a "'sudden, *serious physical injury* to a *third person* negligently *caused* by the defendant,'" *id.* at 712, insofar as William, not defendant, caused the injury to Mrs. Derby; and (2) Mr. Derby did not "'perceive[] the events that caused injury to the third person as they occurred,'" *id.* at 713, because, under plaintiffs' theory, it was defendant's treatment of William while he was in jail that caused Mrs. Derby's injury.

We are not persuaded by defendant's argument. As required under the *Restatement*—which was adopted in *Philibert*—Mr. Derby perceived, "contemporaneously," the "sudden serious bodily injury" of a close family member, Mrs. Derby. And, as the jury determined, that injury was "caused" by defendant's negligence. *See Restatement* § 48 (one who «negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury"). That remains true even though there was also another cause of the injury—*i.e.*, William stabbing Mrs. Derby—which was set in motion by defendant's negligence.

Moreover, defendant has not pointed us to any authority—and we are not aware of any—that requires a plaintiff to perceive a defendant's negligent conduct where that conduct has later caused injury to recover under the test set forth in the *Restatement*. And, for three reasons, we reject defendant's argument that a plaintiff seeking to recover damages for negligent infliction of emotional distress must have perceived a defendant's negligence.

First, as the court recognized in *Philibert*, the test set forth in the *Restatement* includes elements that, "on the basis of human experience, are objective indicators of possibly serious emotional injury." *Philibert*, 360 Or at 715. We think human experience teaches that it is the contemporaneous perception of serious bodily injury to a close family

member that is an "objective indicator" of "possibly serious emotional injury," not the perception of a defendant's negligent conduct or how that negligent conduct played a role in the serious bodily injury. That is, it is the contemporaneous perception of serious bodily injury to a close family member that makes "a plaintiff's claims of subjective emotional distress [] more likely to be genuine," not a plaintiff's perception of a defendant's negligent conduct.

Second, the proposed rule advanced by defendants—*i.e.*, that a plaintiff seeking to recover damages for negligent infliction of emotional distress must have perceived the defendant's negligence—seems inconsistent with the common law on which section 48 of the *Restatement* is based. *See, e.g.*, *Culbert v. Sampson's Supermarkets Inc.*, 444 A2d 433, 433 (Me 1982) (complaint adequately stated negligent infliction of emotional distress claim against baby food manufacturer when baby food was contaminated by foreign substance and later fed to infant); *see also Folz v. State*, 110 NM 457, 460, 797 P2d 246, 249 (NM 1990) (recognizing that "[i]n some cases, a single, negligent act on the part of the state may coincide with the event that gives rise to damages and liability, such as in the negligent operation of a motor vehicle by an agent of the state. In many other cases, multiple negligent acts or omissions of the state *will antedate the event* giving rise to liability." (Emphasis added.)); *Restatement* § 48 comment a (identifying *Folz* and *Culbert*, among other cases, as following the approach to negligent infliction of emotional distress adopted in *Dillon*, upon which the rule stated in *Restatement* section 48 is based).[8]

---

[8] We also note that, as defendant sees it, Mr. Derby's negligent infliction of emotional distress claim necessarily fails under either the first or the third elements of the *Philibert* test. Defendant argues that "if Mr. Derby is found, under the first element, to have witnessed William's physical attack that *defendant negligently caused*, then Mr. Derby did not perceive the events of defendant's conduct that allegedly caused injury to Mrs. Derby as they occurred, because those events allegedly occurred at the jail." (Emphasis in defendant's brief.)

That argument, we think, reads the court's explanation in *Philibert* of the test set forth in the *Restatement* out of context. As indicated by our discussion of *Philibert* above, we understand the first element of the *Restatement* test identified in *Philibert* to require that the plaintiff's conduct negligently cause the injury at issue: Here, the jury found that defendant's conduct did. And we understand the court's discussion of the third element of the *Restatement* test identified in *Philibert* to be focused on whether the plaintiff contemporaneously perceived the injury, because of the "the visceral experience of witnessing the sudden death or

Third, the proposed rule advanced by defendants—*i.e.*, that a plaintiff seeking to recover damages for negligent infliction of emotional distress must have perceived the defendant's negligence—is inconsistent with the recent development of the common law: In *Downey v. City of Riverside*, 323 Cal Rptr 3d 109, 551 P3d 1109 (2024), the California Supreme Court held that to assert a claim for negligent infliction of emotional distress a bystander who contemporaneously perceives the sudden serious injury of a close family member need not also "show contemporaneous perception of the causal link between the defendant's conduct and the victim's injuries"; that is, a plaintiff need not show contemporaneous perception of how "defendants may have contributed to th[e] injury." *Id.* at 560-61, 551 P3d at 1122. Although *Downey* is not binding, particularly given the California Supreme Court's role in the development of the law of "bystander liability" with *Dillon* and its progeny, we think *Downey* is persuasive authority on this issue.

Thus, we conclude that the test adopted in *Philibert* does not require that a plaintiff witness a defendant's negligent conduct to recover damages for "serious emotional harm," where that emotional harm is caused by that plaintiff's contemporaneous perception of the "sudden serious bodily injury" of a "close family member," and that "sudden serious bodily injury" is caused by the defendant's negligence. Nor, as we see it, is a defendant insulated from liability for a plaintiff's "serious emotional harm" where the defendant's negligent conduct caused a person to engage in a violent act, and that violent act is what caused the "sudden serious bodily injury" that the plaintiff seeking recovery for serious emotional harm witnessed.

Finally, we note that, in contending that Mr. Derby's claim fails, defendant argues that this case is like *Hammond*. As noted above, in *Philibert* the court explained that the plaintiff's claim in *Hammond* was not viable, because "although the defendant [in *Hammond*] may have contributed to the death by failing to respond quickly enough, the defendant did not cause the actual physical

---

injury of a loved one." 360 Or at 712. There is no dispute that Mr. Derby witnessed William attack Mrs. Derby with a knife.

injury—the heart attack." *Philibert*, 360 Or at 713. Indeed, in *Hammond*, the "sudden serious bodily injury"—*i.e.*, the heart attack—preceded the 9-1-1 service's negligence, so the 9-1-1 service could not have caused it. But this case is different. In this case, the jury found that defendant *did cause* the actual physical injury to Mrs. Derby when its conduct caused William to attack Mrs. Derby with a knife. And it found that that would not have occurred but for defendant's negligence. Consequently, we think that defendant's reliance on *Hammond* is misplaced.

Affirmed.

**KAMINS, J., dissenting.**

William Derby, a 51-year-old man, has been in and out of rehabilitation facilities and jails for various crimes most of his adult life. Twelve days after he finished serving a 56-day stint at the Columbia County jail, he assaulted his mother (who had previously taken out a restraining order against him). The majority, after ably working through Oregon precedent, concludes that the jail where William most recently stayed can be held responsible for causing that crime. Because that result flies in the face of the purposes of tort law, the role of jails and prisons in our society, and basic human autonomy, I respectfully dissent. The trial court should have granted defendant's motions for summary judgment and directed verdict, because the jail is not responsible for the future wrongdoing of an offender formerly in its custody whom it was legally obligated to release. Therefore, I would reverse and remand.

In *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 15, 734 P2d 1326 (1987), Oregon tweaked the nomenclature of liability-limiting concepts in tort, but that choice was never intended to fundamentally set Oregon apart in their application. The majority opinion, however, takes another step in a long line of cases moving Oregon away from the tethers set forth in treatises, the *Restatement*, and case law from other jurisdictions. The result of that departure is that practitioners are forced to decipher dozens of cases lacking consistency, trial courts are given little guidance in resolving the legal issues raised by parties, and, perhaps, worst of

all, future tort defendants lack any clear understanding of what conduct should be avoided.

It appears that there have been (at least) two major missteps in tort law's evolution in Oregon leading to this disarray. First, Oregon has departed from the majority rule that, if someone other than the defendant causes an injury, liability should only attach if the defendant had a duty either to protect the injured or to prevent the bad actor from causing injury. Second, if a duty deriving from a status or special relationship exists, despite our caselaw suggesting otherwise, someone outside that relationship cannot enforce the duty through general notions of foreseeability.

## I.   BACKGROUND

In 2016 (a year before he assaulted his mother), William Derby served seven months in the Columbia County jail for felony possession of methamphetamine and multiple probation violations. When he was released, he spent several months as a transient (he could not go to his parents' house because both parents had restraining orders against him). After violating his probation multiple times, he returned to the Columbia County jail for nearly two months in February 2017. Four days after his release, he collapsed in his parents' home and was taken to the hospital for mental health treatment. He spent four nights at two different hospitals and was discharged because his symptoms were resolving with medication. On April 16, 2017, 12 days after he left jail, and four days after he left the hospital, he assaulted his mother with a knife.

William's parents sued the jail, alleging that the jail's mistreatment of their son—including failing to provide him basic necessities, imposing excessive solitary confinement, failing to provide mental health treatment and other medical care, and inadequately training staff on mental health issues—caused him to assault his mother. After multiple pretrial motions to dismiss and for summary judgment, the case proceeded to trial for a jury to determine if the jail mistreated William. Plaintiffs' theory was that William was akin to a gentle dog who had been chained and abused such that when the chains came off, the dog became aggressive

and bit. After a nine-day trial, the jury concluded that the jail did not deny William mental health treatment, medical care, or medication. The jury also concluded that the jail did not excessively discipline William or deny him basic necessities. In short, the jury determined that none of the mistreatment William's parents alleged—the things that could make the gentle dog aggressive—had occurred.

The jury did, however, conclude that the jail's staff was not adequately trained regarding mental illness. And it was because of that lack of training—and not any actual thing resulting from a lack of training—that the jury found the jail legally responsible for William's mother's injuries. Put differently, the jury found that inadequate staff training caused William to attack his mother. At the risk of repetition, a jail, by housing an offender who interacted with inadequately trained staff, was held responsible for the offender's crimes committed nearly two weeks after his release, including time spent in two hospitals for mental health treatment. That verdict only underscores the danger of Oregon's inconsistent and idiosyncratic jurisprudence defining the gatekeeping role of the court in negligence determinations.

## II.   ANALYSIS

### A.   *Foreseeability*

Consistent application of legal principles is required to achieve the aims of the system of tort law: to compensate injured parties and deter undesirable behavior. *Bagley v. Mt. Bachelor, Inc.*, 356 Or 543, 551, 340 P3d 27 (2014) (citing W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 4, 20-25 (5th ed 1984) and Dan B. Dobbs, *The Law of Torts* § 8, 12 (2000) (most commonly mentioned aims of tort law are compensation of injured persons and deterrence of undesirable behavior)). In service of those goals, courts and scholars have spilled ink for centuries attempting to establish principles to determine when liability attaches to blameworthy conduct and when it does not.

Every first-year law student can reflexively recite the traditional liability-confining requirements of a negligence claim: duty, breach, causation, and damage. *Towe*

*v. Sacagawea, Inc.*, 357 Or 74, 86, 347 P3d 766 (2015) ("Traditionally, the basic elements of common-law negligence required a plaintiff to plead and prove that the defendant owed the plaintiff a duty, that the defendant breached that duty, and that the breach was the cause-in-fact of some legally cognizable damage to the plaintiff." (Internal quotation marks and brackets omitted.)). The concepts of duty, breach, and causation confine liability to ensure that liability only attaches to actors that are both culpable and responsible for the injury.

Oregon flew with her own wings in tort law years ago by reformulating the traditional "verbal crutch[es] for confining liability" of duty and proximate cause. *Fazzolari*, 303 Or at 8, 15. In Oregon, rather than the "'duty, breach, cause' sequence [being] routinely recited as the formula for every negligence case," *id*. at 15, the *Fazzolari* court set Oregon on the path of "foreseeability" for traditional common law negligence claims:

> "[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

*Id*. at 17; *see also Piazza v. Kellim*, 360 Or 58, 70-71, 377 P3d 492 (2016) (under *Fazzolari*, "the more traditional duty-breach and proximate-cause analyses in a common-law negligence claim are subsumed in the question whether the defendant's conduct resulted in a reasonably foreseeable and unreasonable risk of harm to a protected interest of the kind that the plaintiff suffered").

Although *Fazzolari* replaced the general conceptualization of negligence with a reasonable foreseeability framework, it was not intended to remove any limitations on liability. Rather, the *Fazzolari* court recognized that the "[b]ounds of liability must be stated somehow if the law was not to make one insure the world at large against all harm from one's negligent conduct," and simply set a different method of achieving the same ends. 303 Or at 6.

Specifically (and explicitly), *Fazzolari* did nothing to upset the court's gatekeeping role in evaluating scenarios *not* subject to a reasonable foreseeability test; those flowing from a duty based in "a status, a relationship, or a particular standard of conduct." *Id.* at 17. That is the first part of the oft-quoted test above: under *Fazzolari*, general foreseeability applies "*unless*" the parties invoke such a relationship, status, or standard of care. *Id.* (emphasis added). According to *Fazzolari,* the two reasons to invoke such a duty are when "an injured plaintiff invokes obligations * * * beyond the generalized standards that the common law of negligence imposes on persons at large" or when a defendant raises a "no-duty" "defensive argument asking a court to limit the reach of these generalized standards as a matter of law." *Id.* at 10. A jury decides, as a factual matter, whether defendant's conduct fell short—either because it did not meet a specific standard of care or because it violated the more general foreseeability standard—that is, caused a reasonably foreseeable injury to a predictable plaintiff. The court, however, as a matter of law, determines whether a specific standard of care applies or whether defendant truly has "no duty" to the plaintiff.

In short, Oregon's path of foreseeability was not designed to replace the limitations on liability fundamental to tort law but rather to propose a different approach to conceptualizing them. "Either formulation—duty or foreseeability—is a method of describing how the law *limits* the circumstances or conditions under which one member of society may expect another to pay for a harm suffered." *Buchler v. Oregon Corrections Div.*, 316 Or 499, 509, 853 P2d 798 (1993) (emphasis added). And those limits are evaluated by a judge, not the jury. *Id.* ("Within those limits, the jury or other factfinder may determine whether to award damages and in what amount. Outside those limits, the judge determines as a matter of law whether the facts alleged or the evidence of them is sufficient to support relief.").

This case presents both scenarios where duty still plays a role in Oregon law—when a defendant raises the "no duty" argument, meaning the case should be dismissed, and where the parties are involved in a special relationship that defines the duty owed by defendant.

B.   *"No Duty"*

A defendant raising a "no duty" defense contends that the injury is too remote as a matter of law absent special circumstances. If a defendant is successful, the court does not move on to evaluate general notions of foreseeability and submit the case to the jury—it simply dismisses the case. *See Fazzolari*, 303 Or at 10 ("[T]he plaintiff loses if the defendant persuades a court to phrase such a limit in terms of 'no duty.'"). Purely economic losses or emotional distress damages are two of those circumstances. *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992) ("[A] negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm."); *Philibert v. Kluser*, 360 Or 698, 702, 385 P3d 1038 (2016) (explaining that Oregon law allows plaintiffs to recover damages for emotional distress when they are physically injured, when the defendant acted intentionally, and "when a defendant negligently causes foreseeable, serious emotional distress and also infringes some other legally protected interest"). If a plaintiff seeks economic damages without a special relationship, or emotional damages that don't result from a legally protected interest or intentional act by the defendant, the court must dismiss the case as a matter of law.

This case also involves a circumstance that, as a matter of law, makes liability more remote: when a third party—not the negligent actor—is the one that causes the physical injury. According to the *Restatement*, a defendant is not responsible for injuries caused by a third party unless a special relationship exists between the third party and the defendant.[1] That relationship must impose a duty on the defendant to have either protected the plaintiff or to

---

[1]  Restatement (Second) of Torts § 315 (1965):

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right to protection."

have controlled the third party. Indeed, *Fazzolari* under-
stood that a special relationship—there, a school and its
students—was required to impose a special duty on a defen-
dant to protect against third-party harm. Thus, consistent
with other provisions of Oregon tort law involving remote
injuries, a "special relationship" is required to impose liabil-
ity on a party for the wrongdoing of another.

    However, it is unclear whether Oregon courts have
adopted the *Restatement*'s common-sense formulation,
despite its consistence with Oregon jurisprudence involv-
ing remote injuries. That lack of clarity is particularly
confounding given that Oregon has explicitly adopted one
of the *Restatement*'s *exceptions* to the common-sense prin-
ciple that liability doesn't attach to injuries caused by a
third party—the special relationship of a jailer to a dan-
gerous person in their custody. *See Restatement (Second) of
Torts* § 319 (1965).[2] *Buchler*, 316 Or at 506 ("We hold that
the common-law rule, delineated by section 319 to define a
custodian's duty in modern times, is the law of this state as
well.").[3] Under *Restatement* section 319, a custodian, unlike
the average person, has a duty to prevent a third party—a
dangerous person in their custody—from causing injury to
another.

    Despite the Supreme Court's adoption of an *excep-
tion* to the rule found in *Restatement* section 315, our court
has explicitly rejected the *rule* found in *Restatement* section
315. Rather, regardless of the existence, or lack thereof, of
a special relationship, we have applied a general foresee-
ability analysis to answer the question of whether the third

_____

    [2] Restatement (Second) of Torts § 319 (1965):

    "One who takes charge of a third person whom he knows or should know
    to be likely to cause bodily harm to others if not controlled is under a duty
    to exercise reasonable care to control the third person to prevent him from
    doing such harm."

    [3] As pointed out by the majority, *Buchler* did go on to analyze plaintiffs' two
non-status-based negligence claims under a foreseeability analysis. 336 Or App
at 390, ___ P3d ___ (Nov 27, 2024) (citing *McAlpine v. Multnomah County*, 166
Or App 472, 481, 999 P2d 522 (2000)).

    However, that analysis in *Buchler* addressed only the failure-to-warn
claims—*not* the general negligence claims. 316 Or at 514. The failure-to-warn
claim already incorporates limitations on liability contained in the *Restatement*.
*See id*.

party's actions were a foreseeable consequence of the defendant's action. *See, e.g.*, *Washa v. DOC*, 159 Or App 207, 221, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403, 69 P3d 1232 (2003) (analyzing defendant's liability for harm caused by criminal act of third party under general foreseeability principles). The concurrence in *Washa* recognized the lack of logic in adopting an exception but rejecting the rule:

> "[*Restatement*] section 315 describes a general rule of *non*-liability, subject to a few specifically defined exceptions. To hold that a party who cannot establish the existence of a 'special relation' under section 319 can, nevertheless, prevail under a theory of general foreseeability, defeats the general principle of nonliability expressed in section 315."

*Id*. at 226 (De Muniz, J., concurring) (emphasis in original).[4]

The source for this court's conclusion that the exception applies, but not the rule, is *Faverty v. McDonald's Restaurants*, 133 Or App 514, 522, 892 P2d 703 (1995), *rev dismissed*, 326 Or 530 (1998).[5] In *Faverty*, an 18-year-old McDonald's employee had been scheduled to work too many hours.[6] *Id*. at 518. The employee's commute to work was 20 miles, as the employer knew, and he fell asleep driving home, causing a car crash that resulted in his own death and injured another motorist. The injured motorist sued McDonald's, alleging that the car accident and his injuries were a foreseeable consequence of the restaurant's decision to allow the employee to work so many hours. *Id*.

McDonald's argued that *Restatement* section 315's general rule of nonliability applied, and that the special relationship of an employer-employee did not create an exception to that rule that would require it to control the conduct of its employee after work. *Id*. at 523. This court agreed that the employee-employer relationship applied and did not provide

---

[4] The Oregon Supreme Court granted review in *Washa* but ultimately affirmed by an equally divided court. *Washa v. Oregon Dept. of Corrections*, 335 Or 403, 69 P3d 1232 (2003).

[5] The Oregon Supreme Court granted review of our 6-4 decision in *Faverty* but dismissed the case on the parties' stipulated motion to dismiss the appeal. 326 Or at 530.

[6] The employee worked a four-hour shift, followed by a four-and-a-half-hour break and an eight-and-a-half-hour overnight shift. *Faverty*, 133 Or App at 518.

a path to recovery for the plaintiff. *Id*. Dissatisfied with that limitation, we nevertheless decided that the plaintiff could recover, under general foreseeability principles, from the defendant for injuries caused by a third party absent any special relationship or other limitation typically applicable to remote injuries. *Id*.

For that proposition, we relied on the adoption of the general foreseeability test in *Fazzolari*—the same case that, as quoted above, explicitly did not disturb the role of the court in dismissing cases where a defendant success- fully sets forth a "no duty" argument:

> "The limitation of section 315 does not arise out of any par- ticular status, relationship or statutory standard of con- duct. It is a standard that, according to the *Restatement (Second) of Torts*, applies to all persons. However, under *Fazzolari*, unless a defendant invokes a special status or relationship, or is subject to a particular statutory stan- dard of conduct, it is subject to the general duty to avoid conduct that unreasonably creates a foreseeable risk of harm to a plaintiff."

*Id*. at 523. That is the entirety of the analysis. We appar- ently concluded that, because the *Restatement's* rule of non- liability is generally applicable—that is, it did not mention a special relationship—it fell within *Fazzolari's* general fore- seeability framework. However, *Fazzolari* did not address the application of *Restatement* rules, but factual scenarios presented by cases. More importantly, under *Fazzolari*, the existence of a special relationship or status *removes* the case from general foreseeability considerations. That is, when a plaintiff pleads that a special relationship exists, but fails to provide a path to recovery from that relationship, general foreseeability should not become the default, available path. *Fazzolari*, 303 Or at 17 ("*unless* the parties invoke a status, a relationship, or a particular standard of conduct," liability depends on whether defendant's conduct "unreasonably cre- ated a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff" (emphasis added)).

Nevertheless, in light of those *Fazzolari* principles that limit liability for tortious conduct of a third party to require more than foreseeability, we concluded in *Faverty*

that the defendant could be held liable because it was reasonably foreseeable that scheduling an employee to work so many hours would make them tired and cause a car accident. *Faverty*, 133 Or App at 525-26.

Clearly, something has gone awry in Oregon tort law, because the *Fazzolari* concepts in place to limit liability have actually expanded it. Indeed, as Justice De Muniz pondered, "[w]hy would, or should, a plaintiff ever attempt to establish liability under the strictures of section 319 when the benign 'reasonable foreseeability' *** is available?" *Washa*, 159 Or App at 227 (De Muniz, J., concurring).

It bears mentioning that the expansion of tort liability in *Faverty* has been repudiated, often derisively, by the courts of other jurisdictions considering it. *Behrens v. Harrah's Illinois Corp.*, 366 Ill App 3d 1154, 1159, 852 NE2d 553, 558 (2006) (observing that "the dissent in *Faverty* is better reasoned" and that the "decision of the Oregon appellate court stands alone as an aberration in negligence law"); *Barclay v. Briscoe*, 427 Md 270, 301-02 & n 17, 47 A3d 560, 579 (2012) (recognizing that "the *Faverty* case has been widely criticized" and observing that the "*Faverty* court's failure to adequately define the nature and scope of the duty imposed on the employer left the opinion open to the criticism that it was merely a value judgment about when and to whom employers should be responsible for their employees' off-work negligence" (internal marks omitted)); *Baggett v. Brumfield*, 1999-1484 (La App 3 Cir 3/1/00), 758 So 2d 332, 338, *writ den*, 2000-0927 (La 5/12/00) ("We are unimpressed with [*Faverty*]"); *Riley v. Keenan*, 406 NJ Super 281, 295, 967 A2d 868, 876 (App Div), *cert den*, 200 NJ 207 (2009) (distinguishing *Faverty*); *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 SW3d 401, 412 n 6 (Tex 2009) (collecting cases); *Brewster v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 361 Ill App 3d 32, 37, 836 NE2d 635, 639 (2005), *appeal den*, 217 Ill 2d 598 (2006) (distinguishing *Faverty*); *Berga v. Archway Kitchen & Bath, Inc.*, 926 SW2d 476, 482 (Mo Ct App 1996) (same).

Like the other scenarios where injuries are more remote, and consistent with the *Restatement*, defendants should not be held liable for the wrongdoing of a third party absent a special relationship.

Here, relying on *Restatement* section 319 and *Buchler*, which adopted that section of the *Restatement*, defendant argued that there was no duty based on the special relationship of a custodian and the status of a third party causing the injury. Defendant was entitled to summary judgment on that basis because, as a matter of law, the jail did not have a responsibility to pay for the injuries caused by William after it released him from custody.

C.  *Heightened Duty*

In addition to the defensive use of "no duty," the other scenario outside *Fazzolari*'s general foreseeability construct is when a special relationship *expands* the bounds of what we may expect from the defendant as compared to the general public. Someone who has a heart attack after negligent treatment by a cardiologist may have a claim against that cardiologist due to the heightened obligations imposed by the doctor-patient relationship. *See Tomlinson v. Metropolitan Pediatrics, LLC*, 362 Or 431, 444, 412 P3d 133 (2018) ("The law therefore imposes on a physician an obligation to meet that standard of care, which is defined by the scope of the physician's undertaking."). But someone who has a heart attack after watching somebody negligently operate a car does not have a claim against that driver under anything other than general foreseeability principles, likely meaning no claim at all. *See Conway v. Pacific University*, 324 Or 231, 240, 924 P2d 818 (1996) ("Another way to characterize the types of relationships in which a *heightened* duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party." (Collecting cases identifying relationships that create heightened duty; first emphasis added; second emphasis in original.)).

As discussed above, defendant did invoke a special relationship here so the principles of general foreseeability should not apply, except to the extent that those principles inform the scope of what defendant can be held liable for within that special relationship. *Fazzolari*, 303 Or at 17 (general foreseeability framework applies "unless the parties invoke a status, a relationship or a particular standard of conduct"). Here, the special relationship or "status" invoked by the parties is that of a custodian. The allegations

in plaintiff's complaint do not exist in a vacuum; they flow from the obligations the jail undertook when it took custody of William.

Specifically, the allegations against the jail include a failure to provide mental health treatment and medical care, including medication, a failure to provide basic necessities such as food and warmth, a failure to adequately train staff regarding mental illness, the maintenance of "policies" detrimental to mental health, and excessive discipline. Those allegations stem entirely from the custodial relationship undertaken by the jail. Defendant's "policies" do not matter in a vacuum—they only matter as to their impact on defendant's conduct regarding William. Plaintiffs' allegations that defendants were negligent in failing to provide "basic necessities" to William (after William skipped multiple meals) is not a claim that could be brought in the absence of the special relationship—plaintiffs could not successfully sue a passerby for failing to provide them food, nor could plaintiffs sue a restaurant for failing to provide enough food to a customer who declined to eat. The jail had heightened obligations to William as a result of its custodial relationship with him, and therefore the obligations that flow from that relationship are also heightened from what an average person owes.

In this case, defendant's negligence in meeting its duty of care to William, at least as framed by the complaint, is governed by the custodial relationship. That relationship does not include plaintiffs. At least as a general matter, plaintiffs cannot enforce the jail's heightened obligations to William, only William can. Accordingly, whether the jail failed to meet its custodial obligations to William cannot support liability between the jail and plaintiffs absent some additional rationale. *See Tomlinson*, 362 Or at 446 (identifying factors to consider when determining whether to extend duties stemming from a special relationship to third parties). That additional rationale recognizes that the duty can be extended to third parties only in certain circumstances to ensure that "the potential plaintiffs were identifiable to the defendant or otherwise could be defined as a class that avoids indeterminate liability." *Tomlinson*, 362 Or at

446. Confining the situations where a duty is heightened to these defined relationships absent limited circumstances fits neatly within the purposes of the system of tort law. A defendant in a special relationship is both more culpable for causing the injury and is in the best position to prevent it.

However, the majority opinion concludes that, despite the existence of a special relationship, general notions of foreseeability allow William's parents to enforce the jail's duties, stemming from the special relationship, owed to William (such as adequate training and policies). That logic, albeit somewhat frequent in Oregon case law, is plainly an end-run around the "unless" clause in *Fazzolari*. It also circumvents the rationale in *Tomlinson* that a defendant's duty derived from a special relationship can only extend to a third party in limited circumstances. Duties stemming from special relationships should not be applicable to third parties through the guise of a general foreseeability analysis.

### D. *Public Policy*

Finally, even if foreseeability governs plaintiffs' claims, despite the fact that the injury was caused by a third party's criminal conduct and that the parties invoked a special relationship, William's assault of his mother nearly two weeks after his release from jail is not a foreseeable consequence of the jail's negligent treatment. And to the extent that a jury and judge could determine that this crime is a reasonably foreseeable consequence of a jail's violation of its custodial duties, it would be appropriate for an exception based on public policy.[7]

In this case, two facts relied upon by the majority that made the injury reasonably foreseeable were William's history of violent behavior and a mental illness whose

---

[7] When considering whether to create a policy exception for failing to exercise ordinary care in one's activities, California courts consider several factors which would favor a policy exception for not attaching liability to jails for the crimes committed by offenders formerly in their custody. *Zuniga v. Cherry Ave. Auction, Inc.*, 61 Cal App 5th 980, 993, 276 Cal Rptr 3d 269, 278 (2021) (discussing factors including the closeness of the connection between the defendant's conduct and the injury, the moral blameworthiness of the defendant's conduct, whether it furthers the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing liability for breach).

symptoms could be worsened in jail. 336 Or App 391, ___ P3d ___ (Nov 27, 2024) (slip op at 15 n 7). However, we have made the decision, as a society, rightly or wrongly, that jails are not places designed for healing, but for punishment, meaning that "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Hudson v. McMillian*, 503 US 1, 9, 112 S Ct 995 117 L Ed 2d 156 (1992) (internal citation omitted). And, as a society, we have decided to send mentally ill individuals to jails at alarming rates. Alan R. Felthous, *Enforced Medication in Jails and Prisons: The New Asylums*, 8 Alb Gov't L Rev 563, 569 (2015) (observing that in 2012, the number of people incarcerated with severe mental illness was "tenfold the number hospitalized").

The result of those choices is that William—a man with a history of both violence and mental illness—is far from unique in the jail population. Indeed, jails and prisons are perhaps the most densely concentrated populations of mentally ill individuals with a history of violence in the nation. Regardless of how one feels about jails, we cannot fix these societal ills by using tort law to make jails responsible for the future crimes of the offenders they house. *See, e.g.*, George W. Conk, *Will the Post 9/11 World Be A Post-Tort World*?, 112 Penn St L Rev 175, 177 (2007) ("[T]ort is not some form of punishment, erratically inflicted. Rather, tort law is a highly elaborated body of thought. It asks what constitutes socially unreasonable conduct and, by reasoned judgment, allocates liability, and assigns responsibility."). The problems need policy solutions, not haphazard tort remedies.

It should not fall to a dissenting voice to say that jails should not be held legally responsible for the crimes committed by the offenders they house. Defendant's motions for summary judgment and directed verdict should have been granted.